UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                                                            DECISION AND ORDER

vs.                                                                                           21-CR-6022-CJS-1
                                                                                           22-CV-6256 CJS

RUBEN BULLOCK,
aka Reuben Bullock,
                        Defendant.
_____

INTRODUCTION

Now before the Court is a motion (ECF No. 22) by Ruben Bullock ("Bullock" or "Defendant") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. For the reasons discussed below, the application is denied.

BACKGROUND

The reader is presumed to be familiar with the history of this action. Briefly, the following facts are taken from the section of the Government's response (ECF No. 23) to Bullock's motion entitled "Relevant Facts and Procedural History," to which Bullock has expressly stated he has no objection:[1]

> In 2006, the defendant, Reuben Bullock, was convicted by way of plea in the United States District Court for the Western District of New York of a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), possession with intent to distribute and distribution of 50 grams or more of cocaine base.[2] He was sentenced to a 210-month term of imprisonment and was released to supervision on August 6, 2018.
>
> In the fall of 2020, Bullock's supervising U.S. Probation Officer was made aware that he was possibly engaged in the sale of narcotics. Pursuant to this information, surveillance was conducted. On January 21, 2021, U.S. Probation searched

---

[1] Bullock's Reply, ECF No. 25 at p. 2.
[2] *See, U.S. v. Bullock*, 6:05-CR-06031-CJS-1.

1

Bullock as well as two residences and one business associated with Bullock. During these searches, cocaine, cocaine base, marijuana, drug paraphernalia, numerous rounds of ammunition, and U.S. currency were seized. (See PSR, ¶ 34-41, 64). A violation petition was filed, and Bullock was arrested and detained. On January 26, 2021, Bullock was charged by Criminal Complaint with possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (PSR, ¶ 4).

On March 1, 2021, Bullock, represented by counsel, appeared before this Court, waived Indictment, and entered a guilty plea to a one-count Information charging a violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute 500 grams or more of cocaine. [A copy of the Plea Agreement is attached as Exhibit 1; a copy of the March 1, 2021, plea proceeding transcript is attached as Exhibit 2]. In the written plea agreement, the parties agreed that an Information pursuant to 21 U.S.C. § 851 would be filed based on Bullock's 2006 serious drug felony conviction. (Ex. 1, ¶ 4). Based on a total offense level of 23 and a criminal history category of III, and taking into account the applicable statutory minimum penalty, the parties agreed that the appropriate United States Sentencing Guidelines ("USSG") range was 120 months. (Ex. 1, ¶ 14; Ex. 2, pp. 2, 9-10, 11-15, 17-20). Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties also agreed to recommend that the Court impose a term of imprisonment of 120 months as part of the appropriate sentence in this case, and that such sentence be imposed to run concurrently with any sentence imposed for the supervised release violation. (Ex. 1, ¶ 15; Ex. 2, pp. 21-22).[3] The plea agreement contained a waiver of both appellate rights and collateral attack rights, and Bullock attested that he understood if he were sentenced to 120 months, he was giving up his right to appeal or collaterally attack that sentence. (Ex. 1, ¶¶ 24, 25; Ex. 2, pp. 20-21). At the plea hearing, this Court made a specific finding that both the plea to the information and the plea to the supervised release violation were being entered into knowingly, intelligently, and voluntarily. (Ex. 2, pp. 33,46).

On May 17, 2021, Bullock appeared for sentencing. . . . This Court accepted the Rule 11(c)(1)(C) plea agreement, and after considering the sentencing factors set forth in 18 U.S.C. § 3553, sentenced Bullock principally to a period of incarceration of 120 months, the exact sentence agreed upon by the parties. (Ex. 3, pp. 11, 17-20). The Court noted that because Bullock was sentenced within the parameters of the plea agreement, he had waived his right to appeal. (Ex. 3, p. 25). The judgment was entered May 19, 2021, and Bullock did not file a notice of appeal.

---

[3] For the violation of supervised release, the Court sentenced Bullock to a term of imprisonment of 51 months to run concurrent to the sentence in this action.

> Thus, Bullock's conviction became final as of June 2, 2021.
>
> On June 3, 2022, Bullock, *pro se*, filed a timely motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 claiming he was deprived of the effective assistance of counsel during the pretrial phase. He requests that his conviction and sentence be vacated, and he be allowed to enter a new guilty plea.

Government's Response, ECF No. 23 at pp. 1-3.[4]

Bullock's motion indicates that his ineffective-assistance claim is based on his retained attorney's alleged failure to "(1) communicate with [him] and inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; (2) conduct an adequate and independent pretrial investigation; and (3) attempt to negotiate a more favorable plea agreement[.]" Section 2255 Motion at p. 4.

Regarding his attorney's alleged failure to communicate with him, Bullock contends that "there was not any regular communication between counsel and [himself] regarding his case," and that counsel "failed to provide sufficient information to [him] so that he could participate intelligently in decisions." ECF No. 22-1 at pp. 13-14. Bullock further contends that his attorney told him that he would get a 60-month sentence for pleading guilty, notwithstanding what the Plea Agreement said. Bullock further states that if his attorney had properly communicated with

---

[4] As referenced earlier, Bullock's prior conviction in this Court in 2006, involved a drug-trafficking crime that he committed while still on parole from a state-court conviction for two counts of Criminal Possession of Narcotic Drug in the 4th Degree.  On the 2006 conviction, Bullock, who was categorized as a career offender, received a sentence including a term of imprisonment of 210 months or 17.5 years.  Bullock had pled guilty pursuant to a Rule 11(c)(1)(C) plea agreement requesting a sentence of 262 months.  However, prior to sentencing the Government filed a motion for a downward departure and a 210-month sentence, which the Court granted. Bullock's sentence was further reduced when, on December 19, 20216, he received an Executive Grant of Clemency which commuted his total sentence of imprisonment to expire on December 19, 2018, conditional upon the completion of the Residential Drug Abuse Program.  As noted earlier, Bullock was actually released to supervision on August 6, 2018.  Less than two years later, while still on supervised release, Bullock had resumed selling narcotics, resulting in this Court issuing a warrant for his arrest on the violation of supervised release.  A search of premises used by Bullock for that purpose recovered "approximately 1,300 grams of marijuana, 1,100 grams of cocaine, $16,554.00 in United States currency, 32 rounds of .38 caliber ammunition, [a pistol holster], cell phones, and other drug packaging and paraphernalia." PSR, ECF No. 13 at p. 8.  Bullock also admitted "that he had previously purchased one kilogram of cocaine for $45,000 and had approximately 780 grams left." *Id*. at p. 9.

him and explained "the sentencing exposure he faced," he would have chosen to plead guilty to the Indictment, so as to preserve his right to appeal. ECF No. 22-1 at p. 19; *see also, id*. at p. 25 ("Bullock was completely misinformed of the relevant circumstances and likely consequences of proceeding to trial rather than pleading guilty."). Although, Bullock does not say what issues he would have raised in the event of such an appeal.

Regarding his attorney's alleged failure to investigate, Bullock contends that his attorney "failed to conduct any kind of a reasonable independent pretrial investigation" before advising him to accept the plea offer. Although, he does not allege that counsel failed to discover any particular information relevant to the plea.

Regarding his attorney's alleged failure to attempt to negotiate a more-favorable plea, Bullock contends that the subject Plea Agreement "did not have any benefit for [him]," and that his attorney should have "ask[ed] the Governnment to withdraw the 851 Enhancement in exchange for [his] guilty plea," and, "alternatively, [that counsel] could have also asked for a 60-month sentence based upon a Total Offense Level of 23[5] and a Criminal History Category of III, establishing a guideline imprisonment range [of] 57 months to 71 months." ECF No. 22-1 at p. 20; *see also, id*. at p. 21 (Asserting that if Bullock had pleaded guilty without a plea agreement, "there is a reasonable probability that this Court would have imposed the same sentence, and he would have retained his right to appeal.").

Bullock further contends that he was prejudiced by his attorney's alleged ineffectiveness, purportedly since he did not receive any benefit in exchange for waving his right to appeal. *See*, ECF No. 22-1 at p. 27 ("Had Bullock proceeded to trial, he would be facing the same mandatory minimum sentence of 120 months[, t]hus, pleading guilty straight up to the information did not

---

[5] This assumes Bullock would still receive a three-point reduction for acceptance of responsibility.

lower [his] sentencing exposure.").

The Government counters that Bullock's arguments are meritless, "as the record clearly demonstrates that [his] plea of guilty was entered knowingly, intelligently, and voluntarily." ECF No. 23 at p. 1.  Regarding such record, the Government has attached to its papers a copy of the Plea Agreement and a copy of the Plea Hearing Transcript and Sentencing Transcript.

The Plea Agreement, which Bullock acknowledges he read and signed,[6] expressly set forth, *inter alia*, that Bullock understood the following: That the Government would be filing a Section 851 information that would form the basis for enhanced penalties due to Bullock's prior conviction for a serious drug felony;  that in exchange for his plea of guilty, he faced a sentence of between 120 months and life; that the Court was not bound by the Sentencing Guidelines, but that if the Court rejected the parties' agreement to a 120-month sentence, or their agreement that any sentence on the violation of supervised release should run concurrently, he could withdraw his plea;  that he was waiving his right to appeal or collaterally attack any sentence of 120 months or less; that the written Plea Agreement represented the total agreement between himself and the Government; and that there were no promises made to him by anyone else other than those contained in the Plea Agreement.  Bullock signed the Plea Agreement below a paragraph stating:

> I have read this agreement, which consists of pages 1 through 14.  I have had a full opportunity to discuss this agreement with my attorney, James Napier.  I agree that it represents the total agreement reached between me and the government.  No promise or representations have been made to me other than what is contained in this agreement.  I understand all of the consequences of my plea of guilty.  I fully agree with the contents of this agreement.  I am signing this agreement voluntarily and of my own free will.

---

[6] The Plea Hearing was conducted by Zoom call due to Covid-19 restrictions.

ECF No. 9 at p. 14.[7]

The Plea Hearing Transcript similarly establishes, *inter alia*, that, in response to questioning from the Court, Bullock, who was under oath, expressly affirmed the following: That he understood that if he had any questions about what was happening, he could stop the proceeding; that he and the Government had agreed to a sentence of 120 months;[8] that in deciding to plead guilty, he had discussed the matter with his attorney and understood the proof of guilt that the Government had against him; that he and his attorney had gone over all the terms and conditions of the Plea Agreement, and that to the extent he had had any questions, his attorney had answered them; that he had had a sufficient opportunity to discuss the matter with his attorney before deciding to plead guilty; that he understood that if he went to trial and was convicted, the *least* amount of prison time that he could receive was 120 months, based on the fact of his prior conviction and the quantity of drugs involved;[9] that he was satisfied with his attorney's advice and representation; that he had read the plea agreement himself; and that he was in fact guilty, both of the new crime to which he was pleading and of the violation of supervised release.

The Plea Hearing Transcript further explains that, from the parties' perspective, the main benefit to Bullock from the Plea Agreement was that any sentence he would receive on the violation of supervised release in his prior case would run concurrent with his sentence in this

---

[7] The Court also read the paragraph to Bullock during the Plea Hearing, and he agreed that it was all true. Plea Hearing Transcript at p. 32.
[8] The record clearly demonstrates that Bullock knew he was agreeing to a 120-month sentence, since he expressly referred to that fact numerous times. *See, e.g.*, Plea Transcript at pp. 8-9. Indeed, the only question that Bullock had about the Plea Agreement related to the terms of supervised release that would be imposed.
[9] Indeed, the following exchange took place: "THE COURT: . . . [W]ith an offense level of 23 and a Criminal History Category of III, the recommended [guideline] range is going to be *below* 120 months; do you understand that?  THE DEFENDANT:  Yes, sir.  THE COURT:  So, why is the Guideline 120 months?  THE DEFENDANT: It's the mandatory minimum.  THE COURT: Exactly.  I couldn't have said it better, mandatory minimum." (emphasis added).

action:

> [AUSA] MR. RODRIGUEZ: Judge, can I interrupt for one moment. I meant to chime in and I couldn't find the unmute button. But I think it's also worth pointing out that in Paragraph 15, there's an 11(c)(1)(C) provision not only to the prison term of 120 months but, also, that that sentence shall run concurrently with any sentence your Honor imposes on the violation of supervised release. *And that, by the way, is the benefit that Mr. Bullock gets pleading guilty in this case*. We agreed under 11(c)(1)(C) that any sentence your Honor imposes on the violation of supervised release -- *which would normally be in addition to* -- in this case will run concurrently or at the same time as the sentence on the criminal charges.
>
> THE COURT: Yes. Thanks for pointing that out, Mr. Rodriguez. That's it exactly what Mr. Napier has negotiated for you. So, part of the 11(c)(1)(C) is a recommendation that the sentence I impose be imposed concurrently which means to run together. And I'm not saying there would be any reason but if for some reason I couldn't go along with that, then that would be another basis for you to withdraw your plea; do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: That's a very, very important point, Mr. Rodriguez that you and Mr. Napier negotiated. Thank you.

Plea Transcript at pp. 21-22 (emphasis added).

Also, during the Plea Hearing, the Court made a finding, based on its observations, that Bullock's plea of guilty was knowing, intelligent, and voluntary. Plea Hearing Transcript at p. 33. In doing so, the Court relied, in part, on Bullock's express statement that, in deciding to plead guilty, he was not relying on any promises by anyone, other than what was contained in the Plea Agreement:

> THE COURT: Now, please listen carefully to this question. Other than the promises contained in the written plea agreement, and my indication to you that I'll give you 8 years of supervised release, have any other promises been made to you to get you to plead guilty?
>
> THE DEFENDANT: No, sir.

7

Plea Hearing Transcript at p. 38.

Finally, the Sentencing Transcript shows that Bullock expressed no surprise or objection when the Court imposed the agreed-upon sentence of 120 months and imposed a concurrent sentence of 51 months for the violation of supervised release.  Rather, he expressed gratitude for the sentence. *See*, Sentencing Transcript at p. 9 ("I'm just going to take the situation for what it is, 120-month sentence. . . .  I'm grateful for the 120 months that I'm going to do right now.  Hopefully, I get some programs and get my mind back on the right track which it already was.").

Again, based upon this record, the Government maintains that Bullock's motion lacks merit, since it demonstrates that he had sufficient opportunity to communicate with his attorney before pleading guilty, that he understood that the agreed-upon sentence was 120 months, and that he received a benefit from the Plea Agreement in the form of a concurrent sentence for his violation of supervised release, all contrary to what he now claims.

The Court has now considered the parties' submissions and the entire record.

## ANALYSIS

Defendant's *Pro Se* Status

Since Bullock is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).  Liberally construing Bullock's submissions, his Section 2255 motion maintains that his attorney provided ineffective assistance in connection with his decision to plead guilty, and, more specifically, that his attorney failed to communicate with him and advise him concerning the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial, failed to conduct an adequate and independent pretrial investigation, and failed to negotiate a more-favorable plea agreement that would provide him with some benefit in

8

exchange for pleading guilty and waiving his right to appeal.

### Section 2255 Principles

Bullock's motion is brought pursuant to 28 U.S.C. § 2255, which provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "[A] collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir.1995) (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).

### An Evidentiary Hearing is Not Required

The Court may dismiss a section 2255 petition without conducting a hearing if the petition and the record "conclusively show" that the defendant is not entitled to relief. 28 U.S.C. § 2255(b). Here, the Court finds that a full evidentiary hearing is not required because there are no material factual disputes and the record conclusively shows that Bullock is not entitled to relief. To the extent Bullock insists that there are issues of fact, they involve statements by him that are not credible since they are contradicted by the record, as discussed below.

### Ineffective Assistance of Counsel

Bullock alleges that he was denied his Sixth Amendment right to effective assistance of counsel, and the legal standards applicable to such claims are well-settled.

To succeed on a claim of ineffective assistance, a petitioner must demonstrate that

9

> "counsel's representation fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Rodriguez v. United States*, 767 F. App'x 160, 163 (2d Cir. 2019); *see also*, *Marston v. United States*, No. 17-CR-298 (JGK), 2020 WL 6701014, at *3 (S.D.N.Y. Nov. 13, 2020) ("[A] petitioner must show both that (1) his counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time, and that (2) counsel's deficient performance was prejudicial to the petitioner's case.").

> Under the first prong of the *Strickland test*, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. There is a "strong presumption" that defense counsel's conduct falls within the broad spectrum of reasonable professional assistance, and a petitioner "bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").
>
> In order for a defendant to prove prejudice under the second prong of the *Strickland* test, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94.

*Marston v. United States*, 2020 WL 6701014, at *3.

As indicated above, the analysis under the first *Strickland* prong is deferential to counsel, such that

> "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *Mason v. Scully*, 16 F.3d 38, 42 (2d Cir.1994) (citation and internal quotation marks omitted). Moreover, when reviewing decisions by counsel, we are instructed not to "second-guess reasonable professional judgments and impose on ... counsel a duty to raise every 'colorable'

claim." *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

*Acevedo v. Capra*, 600 F. App'x 801, 803 (2d Cir. 2015); *see also, Carmichael v. Chappius*, 811 F. App'x 41, 43 (2d Cir. 2020) ("A court must make allowances for counsel's strategic choices and apply 'a heavy measure of deference to counsel's judgments.'" [*Strickland*, 466 U.S.] at 691, 104 S.Ct. 2052.").

Moreover, the showing under the second *Strickland* prong must be substantial, taking into consideration the strength of the prosecution's case:

> To establish *Strickland* prejudice, [the defendant] must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. That is, [the defendant] must show that he was "deprive[d] ... of a fair trial, a trial whose result is reliable." *Id*. at 687, 104 S.Ct. 2052; *see also [Harrington v.] Richter*, 562 U.S. [86,] 111, 131 S.Ct. 770 [(2011)] ("*Strickland* asks whether it is 'reasonably likely' the result would have been different." (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052) ). "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently"; instead, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12, 131 S.Ct. 770 (emphasis added); *see also Strickland*, 466 U.S. at 693, 104 S.Ct. 2052 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (internal citation omitted)).
>
> The prejudice analysis should also "be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" *Hill v. Lockhart*, 474 U.S. 52, 60, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). The prejudice inquiry is therefore ineluctably tied to the strength of the prosecution's evidence. "[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'" *Waiters [v. Lee]*, 857 F.3d [466,] 480 [(2d

Cir. 2017)] (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052). As a result, "[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001).

*Garner v. Lee*, 908 F.3d 845, 861–62 (2d Cir. 2018).

Since a defendant is required to establish both *Strickland* prongs to prevail, a court is not required to consider both prongs where it is evident that the defendant cannot meet a particular prong:

> A court has flexibility in how it decides a claim of ineffective assistance. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." [*Strickland*, 466 U.S.] at 697, 104 S.Ct. 2052. Consequently, if a defendant does not successfully establish either the performance prong or the prejudice prong, the ineffective assistance claim fails, and the remaining prong becomes moot. *See id*.

*Carmichael v. Chappius*, 811 F. App'x at 43–44.

In the instant case, Bullock has not made a sufficient showing on either of the *Strickland* prongs. Regarding the alleged errors by his attorney, Bullock's claims are mostly after-the-fact assertions that are flatly contradicted by the contemporaneous record. For example, Bullock's contentions that there was no communication between himself and his attorney, and that his attorney failed to properly advise him whether or not to plead guilty, are decisively refuted by the Plea Hearing Transcript, in which he stated just the opposite while under oath. Similarly, Bullock's insistence that he believed (from speaking with his attorney) that he would receive a sentence of sixty months, rather than 120 months, is obviously false. The record, including Bullock's own sworn statements, shows that he understood that in exchange for pleading guilty he would receive a sentence of 120 months, not sixty months.

The falsity of Bullock's assertion that he received no benefit from pleading guilty is also

clearly demonstrated by the record.  That is, the record clearly shows that Bullock obtained a benefit in the form of a concurrent sentence, rather than a consecutive one, for his violation of supervised release.  Indeed, the low end of the recommended guideline range for that violation was 51 months, which the Court imposed to run concurrent with the 120-month sentence. Bullock therefore clearly obtained a benefit from the Plea Agreement.

Bullock nevertheless insists that, "[t]here is no reason to believe that the supervised release sentence would not have been run concurrently anyway."[10]  However, he is mistaken. *See, e.g., United States v. Shropshire*, No. 22-4733, 2023 WL 6410917, at *1 (4th Cir. Oct. 2, 2023) ("[I]n situations where the defendant committed a new criminal offense while on supervised release, the Guidelines recommend that the sentences for the offense and the supervised release violation run consecutively. U.S. Sentencing Guidelines Manual § 7B1.3(f), p.s. (2021)."); *see also*, U.S.S.G. § 7B1.3(f) ("Any term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.") (2023); *United States v. McLarty*, No. 22-1984, 2024 WL 3219488, at *3 (2d Cir. June 28, 2024) ("McLarty's revocation sentence was designed to sanction his breach of trust, not the underlying robbery conspiracy, and a logical way to achieve that end was to impose consecutive sentences for the two offenses. Indeed, the Sentencing Commission's policy statements advise district courts to do just that, see U.S.S.G. § 7B1.3(f) (stating that revocation sentences should be imposed "consecutively"), and we have repeatedly affirmed consecutive revocation sentences on that basis, *see, e.g., United States v. Kyzer*, 844

---

[10] Reply, ECF No. 25 at p. 5.

F. App'x 422, 424 (2d Cir. 2021) ("[I]t was not unreasonable for the district court to rely on the same offense conduct in imposing both sentences consecutively because one sentence was for the new conviction and the other was for the supervised release violation."); *United States v. Rivera Santiago*, 834 F. App'x 630, 633 (2d Cir. 2020) (similar).").

Apart from those alleged errors by counsel, Bullock relies only on his own bald assertion that, in hindsight, his attorney should have negotiated harder and somehow forced the Government to refrain from filing the Section 851 Information and to agree to a sentence of sixty months.  However, in light of the facts of this case, including Bullock's lengthy criminal history and the fact that he was admittedly caught red-handed with almost a kilo of cocaine[11] while still on supervised release, the performance by Bullock's counsel in negotiating the subject plea agreement clearly falls within the wide range of reasonable professional assistance.

Nor, even assuming that Bullock had actually shown errors by his attorney, has he shown any prejudice therefrom.  In that regard, the case against him was extremely strong, and, against that, he makes only unsupported assertions that his attorney failed to investigate his case and gave bad advice that resulted in him waiving his right to appeal.  However, Bullock has not identified any information that might have been gained from a more-exhaustive investigation, nor has he identified any potentially-meritorious claim that he could have raised on appeal if he had pled guilty without a plea agreement.  In sum, Bullock has not shown that his attorney's conduct fell below prevailing professional norms or that he was prejudiced as a result. Accordingly, his Section 2255 motion is denied.

---

[11] *See, e.g.*, Plea Agreement ¶ 7(e) ("The defendant was advised of his *Miranda* rights and acknowledged that he understood them and agreed to waive his rights speak with the officers. The defendant stated that he had purchased a kilogram of cocaine the day before for $45,000 from a subject in Rochester, New York. The defendant estimated he had approximately 780 grams left of cocaine inside his residence on Saranac Street. The defendant also advised he had marijuana inside the residence along with $15,000 in United States Currency.").

CONCLUSION

The application under 28 U.S.C. § 2255 (ECF No. 22) is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Defendant has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is directed to close the civil action.

So Ordered.

Dated: Rochester, New York
October 17, 2024

ENTER:

_Charles J. Siragusa_
CHARLES J. SIRAGUSA
United States District Judge